IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2016

## STATE OF TENNESSEE v. JESSICA TRAMEL aka JESSICA TROTTER-LAWSON

**Direct Appeal from the Criminal Court for Washington County**
**No. 37276     Stacy Street, Judge**

**No. E2015-00694-CCA-R3-CD**
**FILED-JUNE 23, 2016**

The appellant, Jessica Tramel, pled guilty in the Washington County Criminal Court to theft of property valued $60,000 or more and received an eight-year sentence to be served in confinement.  The trial court also determined that she owed $193,314.64 restitution.  On appeal, the appellant claims that the trial court erred by denying her request for alternative sentencing and by applying only one-half of an insurance company's payment to the victim to the amount of restitution.  Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which, ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

C. Brad Sproles, Johnson City, Tennessee, for the appellant, Jessica Tramel.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Anthony Wade Clark, District Attorney General; and Ken Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In September 2011, the Washington County Grand Jury indicted the appellant for theft of property valued $60,000 or more, fraudulent use of a credit card to obtain

property valued $60,000 or more, and seven counts of identity theft. The indictment alleged that the victim of the crimes was Unaka Avenue Baptist Church (hereinafter "Unaka") and that the crimes occurred between May 1, 2008, and May 30, 2011. In July 2014, the appellant pled guilty to count one, theft of property valued $60,000 or more, a Class B felony. Pursuant to the plea agreement, she received an eight-year sentence as a Range I, standard offender. The trial court was to determine the manner of service of the sentence and the amount of restitution after a sentencing hearing.

At the beginning of the April 2015 hearing, counsel for the appellant advised the trial court that "the count that she pled guilty to was the result of checks that were -- that were wrongfully used by her. Some of the counts involve forgery, some involve use of a credit card and -- and other sources that the state did not proceed on. So, our -- our position is that, you know, we're here for alternative sentencing on that count not to -- to try her for -- for what the state didn't pursue in those other counts." Defense counsel requested that the court not consider any evidence related to the dismissed counts, but the trial court ruled that it could hear the evidence in order to consider factors relevant to alternative sentencing in count one.

David Carper testified that he had been a member of Unaka since 1986, became the Assistant Treasurer in April 2010, and currently was a deacon. In June or July 2005, Unaka hired the appellant as the church secretary. Mr. Carper stated that "[t]here were some circumstances that we found out later. So, our church, in a sense, gave her a second chance by hiring her knowing of her past record that she had." Unaka even gave the appellant time off and kept her job for her when she was away to serve a previous sentence.

Mr. Carper testified that as the church secretary, the appellant was the administrative assistant to the pastor and staff. She also was responsible for printing checks to creditors. Unaka's Treasurer and Assistant Treasurer would then sign the checks. In April 2011, Unaka's bank telephoned Mr. Carper and told him that a check drawn on the church had "bounced." The check had been written to the appellant. Church members requested Unaka's bank and credit card statements and discovered that the appellant had made hundreds of "online" purchases with church credit cards since April 2007. Mr. Carper said he did not know if the appellant possessed the actual credit cards she used to make the purchases or just the credit card numbers. At first, the appellant used the credit card numbers of staff members who had left the church. Later, she requested and received her own credit card, which she "maxed out in three months [at] $20,000." Mr. Carper stated that the appellant's use of the credit cards continued for four years and totaled about $193,000, which included "additional fees and interest charges." The appellant also printed 146 checks that she made payable to herself. The checks totaled about $230,000.

Mr. Carper testified that Unaka terminated the appellant's employment on April 12, 2011, and filed an insurance claim for the lost money. The insurance company paid Unaka $75,000, which "served as a cushion" for the church to pay its vendors. However, Unaka still ended up with $273,000 worth of debt, so Unaka obtained a loan in that amount to pay the debt. The loan was payable over fifteen years, added $27,000 to the church's yearly budget, and had a "total cost" of $387,317.00. Mr. Carper stated that "we're losing two to three thousand dollars a month" and that Unaka would run out of money in about three years unless revenue increased. He said Unaka could sell some property it owned in order to continue paying the loan.

Russell Stover testified that he was Unaka's Treasurer from 2002 until he left the church in 2011 or 2012. At some point, Mr. Stover opened a credit card account for the church. However, unbeknownst to him, he was the "personal guarantee" for his credit card and all subsequent cards that were issued on the account. After Unaka discovered the appellant's actions, Mr. Stover learned that his credit card had been "maxed out" and that the credit card company was holding him personally responsible for the debt. The company wanted him to pay about $80,000. Eventually, the district attorney advised the company that the purchases on the account were fraudulent, so the company relieved him of the debt. However, resolving the problem took about one year, and Mr. Stover was unable to obtain a loan for his business during that time. The State showed Mr. Stover checks made payable to the appellant and allegedly signed by him. He said that his name had been forged and that he never authorized the appellant to sign his name.

Buford Stone testified that he had been a member of Unaka since 1951, served as the Assistant Treasurer when Mr. Stover was the Treasurer, and was the current Treasurer. The State showed Mr. Stone checks made payable to the appellant and allegedly signed by him. He said his signature on the checks had been forged. He stated that when the bank first contacted Unaka about its overdrawn account, the account had been "cleaned out." Mr. Stone and David Carper were able to stop payment on a $3,000 check, which "was all we had." They notified the congregation, and the congregation quickly raised $14,000 in donations. However, "that really wasn't enough." Mr. Stone said that Unaka now had a monthly loan payment and needed to collect $4,300 per month to meet its operational budget. He said that "we're getting a lot less than that" and that Unaka would be "broke" in three years. He acknowledged that the church's future was in doubt.

On cross-examination, Mr. Stone acknowledged that as the Assistant Treasurer, he worked closely with the appellant. However, he never authorized her to sign checks for him.

Sherry Miller testified for the appellant that she was a member of Unaka for about six years but left the church about one and one-half years before the appellant's sentencing hearing. She said that when the congregation learned about the appellant's actions, some members wanted the appellant prosecuted and some "wanted to show mercy and grace to her." Defense counsel asked how the appellant "was allowed to access that much money," and Ms. Miller answered, "My understanding [was] that the people who were supposed to be overseeing Jessica did not do their job, that there were months on end where they weren't looking at the statements." Ms. Miller said that the appellant recently had started a business involving computers and that confining the appellant would prevent her from working to make restitution to Unaka.

David Trotter, the appellant's father, testified that he had worked as a pastor and missionary. Regarding Unaka's hiring the appellant, he stated,

> When she was interviewed they found out about her prior offense. They actually called me in and there was a group of people in the office, and there was a decision at that point to offer Jessica a job under some restrictions. But, the main thing was, as I said, she will do very well just don't give her any access to any money. . . . And they all nodded and said, yes, absolutely no access to any money.

Mr. Trotter said he thought Mr. Stone and the pastor were present at the meeting. When Mr. Trotter learned the appellant had stolen money from Unaka, he was "horrified." He said that the appellant started a business after the thefts came to light and that she was willing to do everything she could to pay restitution. She also began taking medication and was "in her right mind for the first time in a long time." Mr. Trotter said society would be best served by the appellant's having the opportunity to make restitution and raise her children rather than being incarcerated.

On cross-examination, Mr. Trotter testified that he had no clear reason as to why the appellant took the money and that "[i]t seemed to be . . . an emotional response to what's going on in her life." The appellant worked "perfectly straight" for Unaka for a long time but started having problems when she became pregnant with twins. The State asked what the appellant did with the money, and Mr. Trotter stated,

> I don't really know. . . . Things like she would go buy many, many blouses, and then take them to [G]oodwill, things like that. . . . It's not like she came home with a Jaguar, which is unfortunate, because if she'd come home with a Jaguar then

we could have dealt with it, but we didn't know about blouses.

Benjamin Tramel testified that he was the appellant's husband and that they married soon after she started working for Unaka. He said that he had a bachelor's degree in corporate finance and that he had made his own calculations in this case. Mr. Tramel determined that over the four-year period at issue, he and the appellant deposited $440,000 into their checking account. Mr. Tramel then subtracted their salaries and determined that the amount of money the appellant took from Unaka by writing checks to herself and depositing them into their account was $152,000. He said $152,000 was "in the ballpark" of the total amount of the checks entered into evidence by the State.

Mr. Tramel testified that despite that amount, he "didn't see anything of value coming through that house." The Tramels did not take any expensive trips, and the appellant did not make any expensive purchases. Tramel said, "If I'd looked at my account, I would have seen it from the first month." However, "one of the conditions of her employment was that she wouldn't be dealing with any money, so, I had no reason to look." After Unaka fired the appellant, Mr. Tramel telephoned Buford Stone and asked how the thefts could have occurred for so long when the appellant was not supposed to be handling money. Mr. Stone told Mr. Tramel, "We were having her sign checks." Mr. Tramel stated,

> I was aware at some point along the line that it was somewhat lackadaisical, that she might have had somebody else's credit card and was going out to make purchases on the church's behalf to fund it or buy products for the Easter Egg Hunt. . . . But, you know, I had no idea that she signed two signatures on a check to write bills to the power board and stuff like that, no idea, so -- so, not until Buford pretty much confirmed it to me that morning I called him.

Mr. Tramel testified that the appellant exhibited "mania" during the four-year period of the thefts. After the thefts were discovered, she started receiving therapy and taking medication so that her "clarity of reality seems to be on par with everybody else." Mr. Tramel said that in January 2015, his employer "let [him] go" and that he had been unable to obtain employment. The appellant created a business in which she did transcription work and graphic design and was supporting their family. She also could pay back the money she took from Unaka. Mr. Tramel said that the appellant "carries this with her every single day," that she had been "absolutely devastated," and that she "wants to make it right the best she can."

On cross-examination, Mr. Tramel testified that the appellant consistently told him that she did not remember using Unaka's credit cards. The appellant told Mr. Tramel that she was "absolutely stunned" when Unaka brought the thefts to her attention. Mr. Tramel said a "significant amount" of the stolen money went to stores such as Victoria's Secret. Nevertheless, he believed the appellant's claim that she did not remember making the purchases. Mr. Tramel said he "grilled" the appellant about the thefts but that "she had no recollection of doing it, that it was like a fog."

Mr. Tramel acknowledged that the appellant cashed some of the checks instead of depositing them into their checking account. He noted that he failed to inspect his own bank account but said that Unaka should have caught the thefts "from the very first month" and that "[t]here was no reason for this to go on as long as it did." The court asked Mr. Tramel to look at a $984.55 check made payable to him on August 17, 2010, for "graphic design work for Unaka Baptist Church." He said he had never seen the check prior to the sentencing hearing and did not endorse it. He acknowledged that the appellant forged the two signatures on the front of the check, forged his signature on the back of the check, and cashed it.

Joan Trotter, the appellant's mother, testified that the appellant was bipolar and that "we first started observing behavior when she was in her late teens." The appellant went to college and did very well but was one semester short of graduating. Mrs. Trotter said that the appellant began consuming alcohol and going to nightclubs and that she thought the appellant needed counseling. However, the appellant was over the age of eighteen "and we had no control over that." The appellant had her first child, separated from her husband, and moved to Memphis. At that point, Mrs. Trotter began to suspect "there was something really wrong" with the appellant. Mrs. Trotter would see ten to fifteen identical blouses hanging in the appellant's closet. The appellant also bought pairs of shoes that looked the same or were not her size.

Mrs. Trotter testified that the appellant moved to Johnson City and worked for a restaurant for about six months. The appellant then applied to work for Unaka, and Unaka expressed an interest in hiring her. The appellant told Unaka about her prior conviction, and Mr. and Mrs. Trotter met with Unaka's hiring committee. Mr. and Mrs. Trotter advised the committee not to hire the appellant "unless she would have absolutely no access to finances." The couple was grateful to the committee for hiring the appellant but was "also relieved because of their assurances to us that she would not be put under temptation in any way." While the appellant worked for Unaka, her unusual behavior continued. For example, the appellant would telephone Mrs. Trotter and ask Mrs. Trotter to pick her up; however, when Mrs. Trotter arrived, the appellant would not remember calling her. Mrs. Trotter knew the appellant needed help and medication. At the time of the sentencing hearing, the appellant had been released on bond for seventeen months.

During that time, the appellant had been seeing a psychiatrist and taking medication and was no longer exhibiting "the extreme behavior."

The appellant testified that she had a previous conviction of theft of property valued $60,000 or more and that the Shelby County conviction involved taking money from her employer. The appellant received an eight-year sentence and served thirteen months in prison. However, this court modified the sentence to probation, and the appellant was released from confinment. About one year later, while the appellant was working for Unaka, our supreme court overturned this court's decision, and the appellant returned to custody.[1] She spent another ten months in confinement and was released on parole. As a result of the charges in this case, the appellant's parole was revoked, and she returned to prison for eighteen months.

The appellant testified that people told her for years to get help but that she was afraid to do so. She said that she was requesting alternative sentencing for four reasons, specifically her four children; that her twins were young; and that she did not want to leave them again. The appellant stated that she had wronged people who were her friends, that she wanted to "make it right," and that she was ashamed and sorry. When Unaka confronted the appellant about the thefts, she was "still in full blown psychosis mode" and was unable to say she was sorry. She said that she was hospitalized the next day and that Unaka and her family had been financially devastated by her actions. After the appellant's most recent release from confinement, she "couldn't even get a job at McDonalds." She became certified in medical transcription, began doing everything she could to pay back the money, and had already paid $1,200 restitution to the court. She also signed a promissory note to reimburse Cincinnati Insurance Company for the $75,000 it paid Unaka. According to the note, the appellant had to pay $100 per month for twenty-four months followed by $200 per month until the entire amount plus interest was paid. However, if the appellant was re-incarcerated, the note became void.

The appellant testified that if she received alternative sentencing, she would also make a monthly restitution payment to the church. She said she currently could pay only $500 per month due to her husband's unemployment but that she wanted to make a large payment if her new graphic design business "really starts taking off." The appellant said she was also willing to assume Unaka's loan, even though the amount of the loan exceeded the amount of money she took with the checks.

The appellant testified that when her employment at Unaka began, she was supposed to be an administrative assistant. However, she began taking on more responsibility, and people at the church trusted her. She stated that if a check needed to

---

[1] See State v. Trotter, 201 S.W.3d 651 (Tenn. 2006).

be mailed but the signers could not be there, "they called me [and said] just sign our names and just mail the checks out." The appellant ran errands for the church and sometimes reimbursed herself for legitimate expenses. She also wrote checks to other people in order to reimburse them for church purchases.

The appellant testified that at the time of the thefts, she thought her mental health was "fine." In actuality, she would go for weeks without sleep, her mind raced uncontrollably, and she self-medicated with alcohol and drugs. The appellant said that she gave away some of the items she bought with Unaka's money and that she threw some items away. The appellant bought items she did not need, would forget that she had bought them, and buy more even though "it could literally be right in front of my face." She said she spent the church's money and ended up with nothing. She described her crime as "huge" and said that "if anybody would have looked two weeks after this started I would have been caught immediately."

The appellant testified that she "never set out to be a thief" but that she "couldn't control it." The appellant said that at the time of the sentencing hearing, she was taking Latuda and that the medication had made "all the difference in the world." She said, though, that she would commit this same crime again if she was not taking medication. She and her husband had health insurance, but her insurance company would not pay the cost of the medication, $987 per month, because her medical issue was considered a pre-existing condition.

On cross-examination, the appellant acknowledged that she took $400,000 from her previous employer in Memphis. She also acknowledged that, like this case, she bought items with the money. However, she had a codefendant in that case, and he controlled much of the stolen money. The appellant's codefendant bought her a mink coat, a car, and diamond jewelry, and they bought drugs and alcohol. Their relationship was abusive, but the appellant never sought help. She said they paid $270,000 restitution in that case.

The appellant acknowledged that she used Unaka's credit cards to buy tickets to the Barter Theater, clothes at Banana Republic, tickets at Tinsel Town Theaters, and tanning sessions at Electric Sun Tanning. She also acknowledged that she used church money to eat at nice restaurants and have her nails done. Regarding purchases at some businesses such as McDonald's, Papa Johns, and gas stations, the appellant said that a "community credit card" was kept in a drawer at the church and that "lots of different people used it." Nevertheless, she said that she was "willing to take the church's word on it" because "my own memory is completely unreliable."

The State introduced the appellant's presentence report into evidence. According to the 2011 report, the then thirty-three-year-old appellant graduated from high school and attended Emory and Henry College. In the report, the appellant gave her account of the previous crime in Shelby County. According to her multi-page statement, the appellant revealed her theft to her employer, Town and Country Jewelers, Inc., in November 2002, and the company assured her that she would not face criminal charges if she cooperated. The appellant claimed in the statement that she cooperated fully and turned over the valuable items she had purchased but that her employer still contacted law enforcement. The appellant stated in the presentence report that she had no health problems and was not taking any medications. The appellant also stated that she had used cocaine "'a couple of times'" but that she stopped using it because "'it almost killed me.'"

At the conclusion of the hearing, the trial court first addressed the amount of restitution. The court noted that the appellant pled guilty only to count one and that "[i]t was stipulated at the time of the hearing that that was limited to the checks that were taken." The trial court rejected the appellant's claim that the amount of money deposited into the Tramels' bank account, less their salaries, reflected the amount taken with checks because "it does not take into account those checks that could be cashed." The court found that the amount of the checks fraudulently written by the appellant was $230,814.64. The trial court noted that Cincinnati Insurance Company paid a $75,000 claim to Unaka but that the claim included the money the appellant took with the checks and the credit cards. The trial court then stated as follows:

> [I]t is impossible for this court to determine how to apply that seventy-five thousand dollars, all to the checks, or all to the credit cards because I don't think that's how that money was paid. But, I do think that the defendant is entitled to -- to credit for that. So, what the court is going to do is simply split that in half and allow thirty-seven thousand, five hundred dollars of the restitution to be -- to be applied toward the -- amount of restitution to be credited for Ms. Tramel.

The court subtracted $37,500 from the amount of the checks and ordered that the appellant pay $193,314.64 restitution.

Next, the trial court addressed alternative sentencing. The trial court found the following enhancement factors applicable: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (6), that "the amount of damage to property sustained by or taken from, the victim was particularly great"; (8), that "[t]he defendant, before trial or

sentencing, failed to comply with the conditions of a sentence involving release into the community; (13)(B), that the defendant was on parole at the time of the felony offense; and (14), that "[t]he defendant abused a position of public or private trust." Tenn. Code Ann. § 40-35-114(1), (6), (8), (13)(A), (14). Regarding factor (14), the trial court noted that the testimony by the victim and her family implied that the church was at fault because it "put the fox in the hen house." However, the court stated that the church gave the appellant a chance and found her not credible when she testified that church members authorized her to sign their names on checks.

In mitigation, the trial court applied the following factors: (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury"; (8), that "[t]he defendant was suffering from a mental . . . condition that significantly reduced the defendant's culpability for the offense"; (9), that "the defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses";[2] and (13), the catchall provision for the "the plight" that confinement would place on the appellant's family and her treatment. See Tenn. Code Ann. § 40-35-113(1), (8), (9), (13). The trial court found that the enhancement factors outweighed the mitigating factors.

The trial court also found that the following factors weighed against alternative sentencing: the appellant's "attempt to explain" her previous conviction in the presentence report, her social history in that she had spent most of her adult life engaged in criminal conduct, her prior criminal history because it involved "the exact same conduct for which she stands convicted in this case," her low potential for rehabilitation, her ability to abide by the terms of probation, the interest of society in being protected from possible future criminal conduct by the appellant, measures less restrictive than confinement had been applied unsuccessfully to her, and confinement was necessary to avoid depreciating the seriousness of the offense. The court also found that the circumstances of the offense "very heavily" weighed against alternative sentencing in that the crime occurred over a number of years, "was not a spur of the moment one time thing," and "was a detailed thought out criminal act that occurred again, and again, and again." The trial court stated that the facts of the offense were "shocking." The court found that the appellant's mental condition and loving family weighed in favor of alternative sentencing. Nevertheless, the trial court denied the appellant's request for sentencing alternative to confinement.

## II. Analysis

---

[2] Regarding factor (9), the trial court stated, "The court finds that mitigating factor Number 9 . . . does apply and that she did assist authorities as stated during the bench conference." The bench conference is not in the appellate record.

A.  Alternative Sentencing

The appellant claims that the trial court erred by denying her request for alternative sentencing.  The State argues that the trial court properly denied the appellant's request.  We agree with the State.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness.  State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing).  In sentencing a defendant, the trial court shall consider the following factors:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is on the appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less.  See Tenn. Code Ann. § 40-35-303(a).  The appellant's sentence meets this requirement.  Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary.  See Tenn. Code Ann. § 40-35-102(6).  The appellant, convicted of a Class B felony, is not considered to be a favorable candidate for alternative sentencing.  Moreover, the following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

Initially, we note two problems with the appellate record. First, the appellant's brief fails to comply with Rule 27(a)(6), Tennessee Rules of Appellate Procedure, which requires that the brief contain "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." The statement of facts in the appellant's brief contains no evidence presented at her sentencing hearing. Second, the appellant has failed to include the transcript of the guilty plea hearing in which the State would have presented the factual basis for the plea. Our supreme court has held that when a record does not include a transcript of the guilty plea hearing, this court should determine "on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in Bise." Caudle, 388 S.W.3d at 279. We conclude that the testimony at the sentencing hearing and the exhibits introduced into evidence provide sufficient information for appellate review. As a result, we may presume that the missing plea hearing transcript would support the ruling of the trial court. See id.

The appellant claims that the trial court failed to consider some of the statutory principles in denying her request for alternative sentencing. Specifically, she complains that the court failed to consider that "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed" and that "[t]rial judges are encouraged to use alternatives to incarceration that include requirements of reparation, victim compensation or community service." Tenn. Code Ann. § 40-35-103(4), (6). She also complains that the trial court failed to consider her potential for rehabilitation and treatment because she has received treatment for her mental health issues, is "more stable and productive," and has been able to start and grow a profitable business. See Tenn. Code Ann. § 40-35-103(5).

The trial court's extensive explanation for denying the appellant's request for alternative sentencing demonstrates that the court carefully considered the principles applicable to sentencing. The court went into great detail, explaining why each factor weighed in favor of or against an alternative sentence. The court found that very few

factors weighed in favor of the appellant's request. Of particular concern to the court was that the appellant again stole a tremendous amount of money from an employer despite having a previous conviction and spending time in confinement for the same offense. In addressing the appellant's potential for rehabilitation, the trial court stated, "And the things that concern me the most are -- are what you said, Judge, I won't stop this unless I stay on medication. Well, there is another way to stop that and that is to keep you incarcerated." We agree with the trial court's assessment of the appellant's potential for rehabilitation and have no hesitation in concluding that the court did not abuse its discretion by denying her request for alternative sentencing.

## B. Restitution

Next, the appellant claims that the trial court erred by applying only one-half of Cincinnati Insurance Company's $75,000 payment to Unaka to the amount of restitution. The State argues that the trial court did not abuse its discretion by applying only $37,500 to the amount. Again, we agree with the State.

In this case, Tennessee Code Annotated section 40-20-116(a) mandates restitution of the stolen property, less the amount restored to the victim. There is no set formula for restitution, but the amount must be reasonable. State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). Moreover, the amount must be based on the victim's pecuniary loss. See Tenn. Code Ann. § 40-35-304(b). When a defendant contests the amount of restitution ordered by the trial court, the standard of review is abuse of discretion with a presumption of reasonableness. See Bise, 380 S.W.3d at 708; Caudle 388 S.W.3d at 279; see also State v. David Allen Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *4 (Tenn. Crim. App. at Nashville, Oct. 25, 2013). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999).

Here, the appellant pled guilty to the count involving the checks, and the count involving the credit cards was dismissed. The trial court determined that the $75,000 payment was the amount Unaka received for its total loss, i.e., from both checks and credit cards, and, therefore, that the equitable solution in determining the amount that had been restored to the victim for the loss of the checks was to "split [$75,000] in half." Thus, the court applied $37,500 to the amount of restitution, leaving the appellant to pay $193,314.64.[3] In our view, the trial court's logic and reasoning was sound. Accordingly, we find no abuse of discretion.

---

[3] The trial court also ordered that the appellant receive credit for the $1,200 she paid to the court clerk and that the clerk forward the money to Unaka.

The appellant contends that it is unfair for the court to apply only one-half of the insurance payment when she is "contractually bound" to repay Cincinnati Insurance Company the entire $75,000. However, the appellant testified that incarceration for the offense voids the promissory note. According to the note, "Both parties understand that, should Jessica Tramel be incarcerated for the <u>entire duration</u> of any sentence entered against her in the underlying criminal action, this Note shall not be effective." Thus, the appellant's contractual obligation to Cincinnati Insurance Company is in doubt, and we are unpersuaded by her argument. Accordingly, we find no abuse of discretion.

### III.  Conclusion

Based upon the record and the parties' briefs, the judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE